UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARLOS DE MARCH BOSCH,<br>Individually and On Behalf of All Others<br>Similarly Situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>CREDIT SUISSE GROUP AG, THOMAS<br>P. GOTTSTEIN, and DAVID R.<br>MATHERS,<br><br>                              Defendants. | Case No.<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Carlos de March Bosch ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Credit Suisse Group AG ("Credit Suisse" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Credit Suisse securities

between March 19, 2021 and March 25, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific.  The Company offers private banking and wealth management solutions, including advisory, investment, financial planning, succession planning, and trust services; and financing and lending, and multi-shore platform solutions.

3.      Credit Suisse has a history of business dealings with Russian oligarchs, or ultra-high net worth business leaders possessing significant political influence.  For example, an article published by *Financial Times* on February 7, 2022, entitled "Credit Suisse securitises yacht loans to oligarchs and tycoons", cited a recent investor presentation for a synthetic securitization deal, in which Credit Suisse sold off $80 million worth of risk related to a $2 billion portfolio of loans backed by assets owned by certain of the bank's ultra-high net worth clients (the "Securitization Deal"), which disclosed that, in 2017 and 2018, Credit Suisse experienced 12 defaults on yacht and aircraft loans, a third of which were related to U.S. sanctions against Russian oligarchs.  Press reports at the time indicated that Russian billionaires Oleg Deripaska, Arkady Rotenberg, and Boris Rotenberg had to terminate private jet leases with Credit Suisse in those years.

4.      Beginning in or around October 2021, Russia commenced a major military build-up near the Russo-Ukrainian border, in apparent preparation for an invasion of Ukraine.  Although the Russian government repeatedly denied it had plans to invade or attack Ukraine, the U.S. later

released intelligence of Russian invasion plans, including satellite photographs showing Russian troops and equipment near the Russo-Ukrainian border.

5.     In November 2021, as Russia's military buildup on the Russo-Ukrainian border continued, the Company entered into the Securitization Deal.

6.     Just months later, on February 24, 2022, Russian military forces invaded Ukraine. In the immediate aftermath of the invasion, Western governments including, among others, the U.S., Canada, and the European Union, imposed significant sanctions on Russia.  The sanctions included, *inter alia*, measures targeting Russia's ultrawealthy oligarchs by denying them access to the global financial system and by, in some cases, authorizing the seizure of certain of their high-value assets located outside of Russia.

7.     Barely a week after the commencement of the Russian invasion and the retaliatory sanctions imposed by Western nations, news outlets reported that Credit Suisse had requested non-participating investors who received information about the Company's loan portfolio to destroy and permanently erase any confidential information that Credit Suisse provided to them regarding the Securitization Deal.

8.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Credit Suisse had deficient disclosure controls and procedures and internal control over financial reporting; (ii) Credit Suisse's practice of lending money to Russian oligarchs subject to U.S. and international sanctions created a significant risk of violating rules pertaining to those sanctions and future sanctions; (iii) the foregoing conduct subjected the Company to an increased risk of heightened regulatory scrutiny and/or enforcement actions; (iv) the Securitization Deal concerned loans that

Credit Suisse made to Russian oligarchs previously sanctioned by the U.S.; (v) the purpose of the Securitization Deal was to offload the risks associated with these loans and mitigate the impact on Credit Suisse of sanctions likely to be implemented by Western nations in response to Russia's invasion of Ukraine; (vi) Credit Suisse's request that non-participating investors destroy documents related to the Securitization Deal was intended to conceal the Company's noncompliance with U.S. and international sanctions in its lending practices; (vii) the foregoing, once revealed, was likely to subject the Company to enhanced regulatory scrutiny and significant reputational harm; and (viii) as a result, the Company's public statements were materially false and misleading at all relevant times.

9.      On March 28, 2022, the U.S. House of Representatives Committee on Oversight and Reform ("House Oversight Committee") sent Credit Suisse a letter asking the Company to turn over information and documents about a portfolio of loans backed by yachts and private jets owned by clients, potentially including sanctioned Russian individuals.  In the letter, House Oversight Chair Carolyn Maloney and Rep. Stephen Lynch, chair of the Subcommittee on National Security, questioned Credit Suisse's request that hedge funds and other non-participating investors "destroy documents" related to yachts and private jets owned by the bank's clients.  "Given the timing of this request and its subject matter," the House Democrats wrote, "Credit Suisse's action raises significant concerns that it may be concealing information" about whether participants in the deal may be "evading sanctions" imposed by the West after Russia's invasion of Ukraine.

10.     On this news, Credit Suisse's stock price fell $0.21 per share, or 2.58%, to close at $7.94 per share on March 28, 2022.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to Credit Suisse's most recent annual report on Form 20-F, as of December 31, 2021, there were 2,569,684,509 of the Company's common shares outstanding.  Credit Suisse's common shares trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in Credit Suisse's common shares located within the U.S., some of whom undoubtedly reside in this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

16.     Plaintiff, as set forth in the attached Certification, acquired Credit Suisse securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Credit Suisse is incorporated in Switzerland with principal executive offices located at Paradeplatz 8, 8001, Zurich, Switzerland.  The Company's common shares trade in an efficient market on the NYSE under the ticker symbol "CS."

18.     Defendant Thomas P. Gottstein ("Gottstein") has served as Credit Suisse's Chief Executive Officer ("CEO") at all relevant times.

19.     Defendant David R. Mathers ("Mathers") has served as Credit Suisse's Chief Financial Officer ("CFO") at all relevant times.

20.     Defendants Gottstein and Mathers are sometimes referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of Credit Suisse's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Credit Suisse's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Credit Suisse, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Credit Suisse and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific.  The Company offers private banking and wealth management solutions, including advisory, investment, financial planning, succession planning, and trust services; and financing and lending, and multi-shore platform solutions.

24.     Credit has a history of business dealings with Russian oligarchs, or ultra-high net worth business leaders possessing significant political influence.  For example, a *Financial Times* article published on February 7, 2022, entitled "Credit Suisse securitises yacht loans to oligarchs and tycoons", cited a recent investor presentation for the Securitization Deal, which disclosed that, in 2017 and 2018, Credit Suisse experienced 12 defaults on yacht and aircraft loans, a third of which were related to U.S. sanctions against Russian oligarchs.  Press reports at the time indicated that Russian billionaires Oleg Deripaska, Arkady Rotenberg, and Boris Rotenberg had to terminate private jet leases with Credit Suisse in those years.

25.     Beginning in or around October 2021, Russia commenced a major military build-up near the Russo-Ukrainian border, in apparent preparation for an invasion of Ukraine.  Although the Russian government repeatedly denied it had plans to invade or attack Ukraine, the U.S. later released intelligence of Russian invasion plans, including satellite photographs showing Russian troops and equipment near the Russo-Ukrainian border.

26.     In November 2021, as Russia's military buildup on the Russo-Ukrainian border continued, the Company entered into a synthetic securitization deal, in which Credit Suisse sold off $80 million worth of risk related to a $2 billion portfolio of loans backed by assets owned by certain of the bank's ultra-high net worth clients.

**Materially False and Misleading Statements Issued During the Class Period**

27.     The Class Period begins on March 19, 2021, the day after Credit Suisse filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 20-F").  That filing touted the Company's "wide range of private banking and Wealth Management solutions tailored for our clients in our Swiss Universal Bank, International Wealth Management and Asia Pacific divisions[,]" including "a broad range of financing and lending solutions across all of our private client segments, including consumer credit and real estate mortgage lending, real asset lending relating to ship and aviation financing for UHNWI [ultra-high-net-worth individuals], standard and structured hedging and lombard lending solutions as well as collateral trading services."

28.     The 2020 20-F also stated:

The entrepreneurs and ultra-high-net-worth individuals (UHNWI) segment is expected to be the fastest growing wealth segment especially in the higher growth emerging markets. We believe that our positioning as the "Bank for Entrepreneurs" by leveraging our strengths in Wealth Management and Investment Banking provides us with differentiated capabilities to protect and grow our clients' wealth and offer an integrated approach across their private and corporate financial needs.

29.     With respect to U.S. regulation pertaining to sanctions on Russian persons and entities, the 2020 20-F stated, in relevant part:

**Sanctions**

As a result of allegations concerning Russian acts related to Ukraine, Syria, cybersecurity and electoral interference, in 2018 and 2019, the US Treasury's Office of Foreign Assets Control (OFAC) designated a number of Russian

government officials, business people and certain related companies as specially designated nationals (SDNs). Such designation blocks their assets and prohibits dealings within US jurisdiction by both the newly designated SDNs and entities owned 50% or more by one or more blocked persons. US law also authorizes the imposition of other restrictions against non-US entities that, among other activities, engage in significant transactions with or provide material support to such blocked persons. In 2019, the US imposed additional sanctions on the Russian Federation prohibiting US financial institutions from participating directly in future primary issues of non-ruble denominated Russian sovereign debt and lending non-ruble denominated funds to the Russian Federation (but not from providing related services such as US dollar clearing to third parties). Further sanctions related to Russia or additional Russian persons or entities are possible, particularly as a result of changes to US foreign policy arising from the transition between presidential administrations, and the potential effects of related disruptions may include an adverse impact on our businesses.

(Emphasis in original.)   Although acknowledging "potential" disruptions that "may" cause an adverse impact on the Company's business with respect to sanctions on Russian persons or entities, this statement failed to disclose the known risks created by the Company's lending practices with respect to Russian oligarchs.

30.     Similarly, the 2020 20-F also stated that "**[e]merging markets, financing and structured credit** includes a range of financing products including cash flow lending, share-backed lending and secured financing transactions and onshore trading in [*inter alia*] . . . Russia" (emphasis in original), which also failed to disclose the known risks created by the Company's lending practices with respect to Russian oligarchs.

31.     Additionally, the 2020 20-F represented that the Individual Defendants "concluded that, as of December 31, 2020, the design and operation of the Group's disclosure controls and procedures were effective, in all material respects"; that "[b]ased upon its review and evaluation, management, including [the Individual Defendants], has concluded that [Credit Suisse]'s internal control over financial reporting is effective as of December 31, 2020"; and that "[t]here were no changes in [Credit Suisse]'s internal control over financial reporting during the period covered by

this report that have materially affected, or are reasonably likely to materially affect, [Credit

Suisse]'s internal control over financial reporting."

32.     On May 6, 2021, Credit Suisse filed its financial report for Q1 2021 as an exhibit

to a report of foreign issuer on Form 6-K with the SEC (the "Q1 2021 Report").  The Q1 2021

Report represented:

> Since the start of 2021, the US, the EU and the UK have announced new sanctions
> in response to alleged Russian activity, including cyberattacks against US
> government agencies and the detention of a prominent Russian opposition activist.
> A detailed assessment of future potential sanctions against Russia and their likely
> impact on Credit Suisse was conducted in 1Q21, including the likelihood of their
> occurrence in 2021.

33.     On November 4, 2021, Credit Suisse issued a press release announcing the

Company's Q3 2021 results.  The press release stated, in relevant part:

> *Wealth Management businesses returned to robust net new assets and higher
> transaction revenues sequentially, while recurring commissions & fees and client
> business volumes demonstrated strong year on year momentum. Our Swiss
> Universal Bank had a record1 third quarter performance. Our Asia Pacific
> business had a resilient performance notwithstanding deleveraging by clients and
> we continue to invest in the region, including in relationship managers and
> building-out our mainland China presence. Our Investment Bank delivered solid
> profitability driven by strong performance across Advisory, Capital Markets,
> Securitized Products and Equity Derivatives. Asset Management reported a further
> improved underlying performance driven across all revenues lines.*
>
> *We have also taken decisive actions to strengthen our overall risk & controls
> foundation, continued our remediation efforts on the Supply Chain Finance Funds
> matter, with our priority to return cash to investors, and made significant progress
> in resolving legacy issues. Our objectives are clear: we want to become a stronger,
> more customer-centric bank that puts risk management at the very core of its DNA
> to deliver sustainable growth for investors, clients and colleagues.*
>
> ***
>
> **Strong pre-tax income growth year on year, together with more conservative
> risk appetite, driven by solid revenue growth and a net release of CHF 144 mn
> in provision for credit losses, partly offset by additional costs, including in
> relation to longstanding litigation issues.**

(Emphasis added.)

34.     Also on November 4, 2021, Credit Suisse issued a press release entitled, "Credit Suisse announces its Group strategy with a clear focus on strengthening, simplifying and investing for growth."   The press release emphasized a purported commitment to risk management, accountability, and responsibility, and stated, in relevant part:

> Following a comprehensive assessment of its strategy, the Credit Suisse Group Board of Directors (BoD) has unanimously agreed on a long-term strategic direction for the Group. The strategy is based on a long-term vision and reemphasizes the integrated model, with a well-defined three-year plan, investing in sustainable growth across Credit Suisse's businesses, while placing risk management and a culture that reinforces the importance of accountability and responsibility at its core. It has also approved the introduction of a global business and regional structure to align the organization with the strategy review and to reinforce cross-divisional collaboration and management oversight.
>
> Work in this direction has already begun as we strengthened our risk management and capitalization, and de-risked the bank while increasing the investment in our core businesses.
>
> ***
>
> **PRIORITIZING RISK MANAGEMENT**
> As part of the outcomes of the strategic review, the bank will continue to focus on risk culture, putting risk management at the heart of all its actions, with investments in data, infrastructure, reporting capabilities, as well as in compliance.
>
> The following initiatives have already been completed or are underway:
>
> - **Fundamental risk review**, examining how risks are being assessed, managed and controlled across the Group.
>
> - Clear **definition of roles, responsibilities and accountabilities** across all divisions, as Credit Suisse continues to implement remediation efforts that were initiated earlier in the year.
>
> - Development of **tools and processes** to improve business accountability and ownership as the first line of defense for risk and controls.
>
> - Revision of **compensation process** and structure, incorporating risk-sensitive performance and non-financial objectives into the enhanced performance scorecards.

- Fostering a culture that reinforces the importance of **personal accountability and responsibility**.

(Emphases in original.)

35.    On February 10, 2022, Credit Suisse hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call").  During the scripted portion of the Q4 2021 Earnings Call, Defendant Gottstein highlighted the Company's purported efforts to improve risk and compliance, stating, in relevant part:

> Firstly, we strengthened our capital position and substantially reduced our risk positions. Secondly, we strengthened risk and compliance teams, systems and processes and underwent a comprehensive risk review across the entire group, which was completed in the fourth quarter; and thirdly, we strengthened our leadership in the investment bank, in asset management, in risk, in compliance, in technology and operations, in wealth management, as well as most recently in human resources. This will not be a quick fix, and we expect 2022 will be a transition year. But we have made clear progress in creating the conditions for a much more stable and predictable bank. All of this in line with our announcements on the 4th of November.

***

> Second, we will continue to improve risk and compliance with an emphasis on risk culture, while it's not losing our client focus and entrepreneurial spirit that has been the hallmark of Credit Suisse since its founding more than 165 years ago.

36.    On February 24, 2022, Russian military forces invaded Ukraine.  In the immediate aftermath of the invasion, Western governments including, among others, the U.S., Canada, and the European Union, imposed significant sanctions on Russia.  The sanctions included, *inter alia*, measures targeting Russia's ultrawealthy oligarchs by denying them access to the global financial system and by, in some cases, authorizing the seizure of certain of their high-value assets located outside of Russia.

37.    Barely a week after the commencement of the Russian invasion and the retaliatory sanctions imposed by Western nations, news outlets reported that Credit Suisse had requested non-

participating investors who received information about the Company's loan portfolio to destroy

and permanently erase any confidential information that Credit Suisse provided to them regarding

the Securitization Deal.

38.     On March 3, 2022, Credit Suisse issued a "group statement" addressing the

foregoing media reports, which stated:

> In response to media reporting that Credit Suisse requested third parties to destroy documents linked to clients, Credit Suisse Group issued the following statement:
>
> "Credit Suisse's entitlement to request non-participating investors to destroy documents relating to this transaction was, as is market practice, stipulated under the Non-Disclosure Agreement. Documents shared with investors did not contain any client names and/or asset identifiers by the blind pool nature of the transaction. They contained portfolio statistics and performance modelling related to the underlying balance sheet positions. No data, client-related or otherwise, has been erased within Credit Suisse and, for clarity, this is in no way linked to the recent implementation of additional sanctions – with which we are fully compliant."
>
> On March 2, 2022, an international financial news outlet published an article referencing a letter which "asks investors to destroy documents linked to oligarch and tycoon yacht loans". This letter relates to a November 2021 synthetic risk transfer transaction, previously reported by the same news outlet, in which engaged parties signed a Non-Disclosure Agreement (NDA).
>
> Following the successful closure of the transaction, Credit Suisse requested non-participating investors to destroy documents relating to the matter, as stipulated in the NDA. Reminding parties to destroy confidential information is good housekeeping and good data hygiene. The transaction and the request to non-participating investors to destroy confidential data are entirely unrelated to the ongoing conflict in Eastern Europe.
>
> No client data was made available to investors. No client data has been erased within Credit Suisse.

39.     On March 10, 2022, Credit Suisse filed an Annual Report on Form 20-F with the

SEC, reporting the Company's financial and operating results for the year ended December 31,

2021 (the "2021 20-F").  The 2021 20-F reported the following with respect to, *inter alia*, yacht

loans in its International Wealth Management business:

In International Wealth Management, gross impaired loans decreased CHF 52 million, primarily driven by ship finance, aviation finance and yacht finance.

\* \* \*

Aviation and yacht finance exposures are collateralized by aircraft mortgages of business jets and vessel mortgages on yachts, respectively, as well as corporate and/or personal guarantees, cash balances, securities deposits or other assets held with the Group. Collateral-dependent loans decreased in 2021, mainly driven by decreases in ship finance as well as aviation and yacht finance, partially offset by increases in lombard loans, commercial loans and residential mortgages. The overall collateral coverage decreased from 89% as of December 31, 2020 to 87% as of December 31, 2021, mainly driven by decreases in higher collateralized exposures.

40.    With respect to its UHNWI segment, the 2021 20-F stated:

We offer a broad range of financing and lending solutions across all of our private client segments, including consumer credit and real estate mortgage lending, real asset lending relating to ship and aviation financing for UHNWI, standard and structured hedging and lombard lending solutions as well as collateral trading services.

41.    In a "Message from the Chairman and the Chief Executive Officer," the 2021 20-F

stated, in relevant part:

We have reviewed our positions and believe that the bank's exposure in relation to Russia is well-managed and that we have appropriate systems in place to address associated risks.

\*\*\*

**Decisive actions and key achievements**
In response to challenges during the year, we completed a comprehensive risk review, substantially reduced our risk positions and strengthened our risk leadership and infrastructure.

\*\*\*

- We bolstered our Executive Board leadership in the Investment Bank, Asset Management, Risk, Compliance, Technology & Operations, Wealth Management and Human Resources.

42.     Further, in discussing the Company's regulation and supervision, the 2021 20-F stated, in relevant part:

**Overview**
Our operations are regulated by authorities in each of the jurisdictions in which we have offices, branches and subsidiaries.

Central banks and other bank regulators, financial services agencies, securities agencies and exchanges and self-regulatory organizations are among the regulatory authorities that oversee our businesses. There is coordination among many of our regulators, in particular among our primary regulators in Switzerland, the US, the EU and the UK as well as in the Asia Pacific region.

The supervisory and regulatory regimes of the countries in which we operate determine to some degree our ability to expand into new markets, the services and products that we are able to offer in those markets and how we structure specific operations.

Governments and regulatory authorities around the world have responded to challenging market conditions by proposing and enacting numerous reforms of the regulatory framework for financial services firms such as the Group. In particular, a number of reforms have been proposed and enacted by regulators, including our primary regulators, which could potentially have a material effect on our business. These regulatory developments could result in additional costs or limit or restrict the way we conduct our business. Although we expect regulatory-related costs and capital requirements for all major financial services firms (including the Group) to continue to be high, we cannot predict the likely impact of proposed regulations on our businesses or results. We believe, however, that overall we are well positioned for regulatory reform, as we have reduced risk and maintained strong capital, funding and liquidity.

The foregoing non-specific risk disclosures were mere boilerplate that failed to disclose the known risks created by the Company's lending practices with respect to Russian oligarchs.

43.     In discussing the Company's risk management, the 2021 20-F stated, in relevant part:

**Risk management oversight**
Risk management is an integral part of the business planning process with strong senior management and Board involvement. We continuously work to strengthen risk management across the Group in an effort to meet the challenges resulting from a volatile market environment and increasing complexity driven by the changing regulatory landscape. Utilizing comprehensive risk management processes and

sophisticated control systems, we continuously work to minimize the negative impact that may arise from risk concentrations.

\*\*\*

The Group's business operations are designed to facilitate a commitment to conscious and disciplined risk-taking. We believe that independent risk management, compliance and audit processes with proper management accountability are critical to the interests and concerns of stakeholders. The Group's approach to risk management is supported by the following principles:

- Establish a clear risk appetite that sets out the types and levels of risk we are prepared to take;
- Have in place risk management and compliance policies that set out authorities and responsibilities for taking and managing risks;
- Seek to establish resilient risk constraints that promote multiple perspectives on risk and reduce the reliance on single risk measures;
- Actively monitor risks and take mitigating actions where they fall outside accepted levels; and
- Breaches of risk limits or tolerances are identified, analyzed and escalated, and large, repeated or unauthorized exceptions may lead to terminations, adverse adjustments to compensation or other disciplinary action.

\*\*\*

**Governance**

Effective governance sets a solid foundation for comprehensive risk management discipline. The Group's risk governance framework is based on a "three lines of defense" governance model, where each line has a specific role with defined responsibilities and works in close collaboration to identify, assess and mitigate risks.

The first line of defense is the front office, which is responsible for pursuing suitable business opportunities within the strategic risk objectives and compliance requirements of the Group. Its primary responsibility is to oversee compliance with relevant legal and regulatory requirements, maintain effective internal controls and help to ensure that the Group operates within its risk appetite. The first line of defense represents the business area or function that allows the risk to enter the Group from clients, employees or other third parties or events and is responsible for managing them or enabling their management. The first line of defense is accountable for managing risks inherent in its activities.

The second line of defense consists of independent risk management, compliance and control functions which are responsible for establishing risk management framework and associated control standards, and providing independent challenge to the activities, processes and controls carried out by the first line of defense. In

this context, the Risk function (Risk) for example is responsible for articulating and designing the risk appetite framework across the Group. The second line of defense can perform and complement the responsibility of identification, measurement, management and reporting of risks, while the first line of defense retains the overall accountability for risk management related to its activities. Independent risk management in the second line of defense is not limited to the Risk and Compliance functions. Instead, it comprises relevant standard setting and independent review and challenge activities over processes and controls carried out by the first line of defense in relation to the risks faced.

The third line of defense is the Internal Audit function, which monitors the effectiveness of controls across various functions and operations, including risk management, compliance and governance practices.

The Group's operations are regulated by authorities in each of the jurisdictions in which we conduct business. Central banks and other bank regulators, financial services agencies, securities agencies and exchanges and self-regulatory organizations are among the regulatory authorities that oversee our businesses. FINMA is our primary regulator.

The Group's governance includes a committee structure and a comprehensive set of corporate policies which are developed, reviewed and approved by the Board, the Executive Board, their respective committees, the Chief Risk Officer of the Group (CRO) and the board of directors of significant subsidiaries, in accordance with their respective responsibilities and levels of authority.

\*\*\*

**Compliance function**

Compliance, headed by the CCO, is an independent global function that works with the businesses to manage risks arising from the potential failure to comply with applicable laws, regulations, rules or market standards. As a second line of defense function, responsibilities include independently assessing compliance risk, executing, monitoring and testing activities and reporting on adherence to our compliance risk appetite and other significant matters to the Board and senior management. Compliance creates, implements and monitors compliance policies and procedures designed to prevent or detect compliance breaches of employees and clients. Compliance is mandated to ensure that regulatory and compliance risks are overseen and managed in the organization and is also responsible for the identification and appropriate remediation of significant breaches of the Group's compliance processes and controls. Compliance runs global risk oversight programs, for example anti-fraud, conflict of interest, cross border and financial crime compliance, and establishes and monitors policies, guidelines, procedures and controls related to potential risks such as money laundering, bribery and corruption and sanctions.

The organizational structure of Compliance is aligned to oversee our divisions as well as our regions and significant legal entities and covers global key compliance topics.

44.     Additionally, the 2021 20-F stated that the Individual Defendants "concluded that, as of December 31, 2021, the design and operation of [Credit Suisse]'s disclosure controls and procedures were effective, in all material respects"; that "[b]ased upon its review and evaluation, management, including [the Individual Defendants], has concluded that [Credit Suisse]'s internal control over financial reporting is effective as of December 31, 2021"; and that "[t]here were no changes in [Credit Suisse]'s internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, [Credit Suisse]'s internal control over financial reporting."

45.     That same day, Credit Suisse issued a press release providing an "update on Russia," which stated, in relevant part:

Credit Suisse Group today published details on its business exposure in Russia as part of its Annual Report disclosures and outlined its stance with respect to the impact of Russia's invasion of Ukraine.

Credit Suisse stands united with the international community in supporting those impacted by this humanitarian crisis.

Thomas Gottstein, CEO of Credit Suisse Group, stated: "I speak for the whole Executive Board of Credit Suisse when saying we are deeply saddened by the Russian invasion of Ukraine. We condemn this invasion and the serious breaches of international law. The instability that these events are creating for societies and countries across the globe will have far-reaching consequences, and our thoughts go out to all those impacted. While we do not have a physical presence in Ukraine, we are committed to providing support to our colleagues and their families within the region. In addition, we have launched a bank-wide appeal in aid of select Red Cross organizations in which Credit Suisse will match the charitable contributions that our employees are making on a one-for-one basis."

"*In purely financial terms, we have reviewed our positions and believe that the bank's exposure in relation to Russia is well-managed, with appropriate systems in place to address associated risks. The current environment means making difficult decisions and managing through challenging situations, but always with*

*a clear sense of perspective and the desire to do the right thing. As a matter of principle and policy, Credit Suisse applies all sanctions, in particular those issued by the EU, the United States and by Switzerland.*"

\*\*\*

Our market risk exposure to Russia as of March 9, 2022 is not significant. Credit Suisse is monitoring settlement risks related to certain open transactions with Russian banks and non-bank counterparties or Russian underlyings as market closures, the imposition of exchange controls, sanctions or other factors may limit our ability to settle existing transactions or realize collateral which may result in changes in our exposure. It is premature to estimate the potential impact of the war in Ukraine on the global economy and markets and on our clients' risk appetite. However, in the short term, the resultant increase in trading and hedging business activity is expected to be offset by a reduction in capital market issuances due to the rise in volatility as well as by higher credit provisions.

(Emphasis added.)

46.     The statements referenced in ¶¶ 27-35 and 38-45 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Credit Suisse had deficient disclosure controls and procedures and internal control over financial reporting; (ii) Credit Suisse's practice of lending money to Russian oligarchs subject to U.S. and international sanctions created a significant risk of violating rules pertaining to those sanctions and future sanctions; (iii) the foregoing conduct subjected the Company to an increased risk of heightened regulatory scrutiny and/or enforcement actions; (iv) the Securitization Deal concerned loans that Credit Suisse made to Russian oligarchs previously sanctioned by the U.S.; (v) the purpose of the Securitization Deal was to offload the risks associated with these loans and mitigate the impact on Credit Suisse of sanctions likely to be implemented by Western nations in response to Russia's invasion of Ukraine; (vi) Credit Suisse's request that non-participating investors destroy documents related to the Securitization Deal was intended to conceal the

Company's noncompliance with U.S. and international sanctions in its lending practices; (vii) the foregoing, once revealed, was likely to subject the Company to enhanced regulatory scrutiny and significant reputational harm; and (viii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

47.      On March 28, 2022, the House Oversight Committee sent Credit Suisse a letter asking the Company to turn over information and documents about a portfolio of loans backed by yachts and private jets owned by clients, potentially including sanctioned Russian individuals.  Specifically, the letter stated, in relevant part:

> We are writing to seek information about a recent report that Credit Suisse asked hedge funds and other investors to destroy documents regarding yachts and private jets owned by Credit Suisse's clients. This report raises significant concerns about Credit Suisse's compliance with the severe sanctions imposed by United States and its allies and partners on the architects and enablers of Russia's brutal and unprovoked invasion of Ukraine, including Russian President Vladimir Putin and oligarchs in his inner circle.

> As part of these sanctions, the United States and other countries have taken actions to identify and freeze the assets of these oligarchs, including "their yachts, luxury apartments, money, and other ill-gotten gains." The Committee is particularly concerned that Credit Suisse's directive to destroy documents regarding its clients' yachts, private jets, and other assets coincided with Switzerland's announcement that it would join the United States, the European Union, and countries around the world in imposing sanctions on Russia.

> According to a recent report, at the end of 2021, as part of an $80 million synthetic securitization deal, Credit Suisse sold off risk related to a $2 billion portfolio of loans backed by yachts, private jets, and other assets owned by the bank's "ultra-high net worth" clients. Although the report did not provide any information about the identity of these bank clients, it stated that, according to an investor presentation, "in 2017 and 2018, Credit Suisse experienced 12 defaults on its yacht and aircraft loans, with a third of these 'related to US sanctions against Russian oligarchs.'" This appears to be a reference to Russian oligarchs Oleg Deripaska and Arkady and Boris Rotenberg, who were forced to sell their jets as a result of U.S. sanctions. Credit Suisse has explained that the documents it "shared with investors did not contain any client names and/or asset identifiers by the blind pool nature of the transaction." If correct, this raises additional questions about how

investors who participated in the deal can ensure their own compliance with U.S. and international sanctions.

We understand that Credit Suisse sent a letter to non-participating investors who received information about this loan portfolio instructing them to "destroy and permanently erase" any confidential information Credit Suisse provided in relation to the transaction. Although some investors described this request as unprecedented, Credit Suisse has insisted it is merely "good housekeeping" that is "in no way linked to the recent implementation of additional sanctions" and "entirely unrelated to the ongoing conflict in Eastern Europe."

Given the timing of this request and its subject matter, Credit Suisse's action raises significant concerns that it may be concealing information about whether participants in the securitization deal, including both Credit Suisse and investors, as well as owners of underlying assets, such as yachts and private jets, may be evading sanctions imposed by the United States and the international community in response to Russia's unprovoked and unjustified invasion of Ukraine.

48.     On this news, Credit Suisse's stock price fell $0.21 per share, or 2.58%, to close at $7.94 per share on March 28, 2022.

49.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Credit Suisse securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

51.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Credit Suisse securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Credit Suisse;

- whether the Individual Defendants caused Credit Suisse to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Credit Suisse securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

55. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

56. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Credit Suisse securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Credit Suisse securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

57. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

58. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

59. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

61. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Credit Suisse securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Credit Suisse securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

62. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Credit Suisse securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Credit Suisse's finances and business prospects.

63.     By virtue of their positions at Credit Suisse, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

64.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Credit Suisse, the Individual Defendants had knowledge of the details of Credit Suisse's internal affairs.

65.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Credit Suisse. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Credit Suisse's businesses, operations, future financial condition and future prospects. As a result of the

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Credit Suisse securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Credit Suisse's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Credit Suisse securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

66.    During the Class Period, Credit Suisse securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Credit Suisse securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Credit Suisse securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Credit Suisse securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

67.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

69.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70.     During the Class Period, the Individual Defendants participated in the operation and management of Credit Suisse, and conducted and participated, directly and indirectly, in the conduct of Credit Suisse's business affairs.  Because of their senior positions, they knew the adverse non-public information about Credit Suisse's misstatement of income and expenses and false financial statements.

71.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Credit Suisse's financial condition and results of operations, and to correct promptly any public statements issued by Credit Suisse which had become materially false or misleading.

72.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Credit Suisse disseminated in the marketplace during the Class Period concerning Credit Suisse's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Credit Suisse to engage in the wrongful

acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Credit Suisse within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Credit Suisse securities.

73.     Each of the Individual Defendants, therefore, acted as a controlling person of Credit Suisse.  By reason of their senior management positions and/or being directors of Credit Suisse, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Credit Suisse to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Credit Suisse and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

74.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Credit Suisse.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  April 29, 2022

Respectfully submitted,

POMERANTZ LLP

<u>*/s/ Jeremy A. Lieberman*      </u>
Jeremy A. Lieberman
Thomas H. Przybylowski
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
tprzybylowski@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I,   <u>Carlos de March Bosch</u>  , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 (the "Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 (the "Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Credit Suisse Group AG ("Credit Suisse" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire Credit Suisse securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or the Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Credit Suisse securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in Credit Suisse securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

DocuSign Envelope ID: DE59B859-5ACB-4AB6-A73E-AD9976FAE603

8.    I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

**Executed** _4/21/2022_____
          **(Date)**

_Carlos de March Bosch_____
          **(Signature)**

Carlos de March Bosch_____
          **(Type or Print Name)**

**Credit Suisse Group AG (CS)**                                              **Carlos de March Bosch**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 6/25/2021 | 20,000 | $10.7880 |