UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CARLOS DE MARCH BOSCH, Individually
and on Behalf of All Others Similarly Situated,

                          Plaintiff,                              **MEMORANDUM
AND ORDER**

           -against-                                22-cv-2477 (ENV)

CREDIT SUISSE GROUP AG, THOMAS P.
GOTTSTEIN, and DAVID R. MATHERS,

                          Defendants.
------------------------------------------------------------x

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

Currently pending before this Court is a single motion for the appointment of lead plaintiff and approval of lead counsel, filed by Yansi Jimenez ("Jimenez" or "movant"). See Motion to Appoint Counsel and Lead Plaintiff (June 28, 2022), Electronic Case Filing ("ECF") Docket Entry ("DE") #6. For the reasons that follow, this Court denies Jimenez's motion.

## BACKGROUND

On April 29, 2022, plaintiff Carlos de March Bosch filed the instant putative class action on behalf of investors who purchased publicly traded securities of Credit Suisse Group AG ("Credit Suisse" or the "Company") during the period between March 19, 2021 and March 25, 2022 (the "Class Period"). See Complaint (Apr. 29, 2022) ("Compl."), DE #1. The Complaint alleges that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), as amended by

the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Credit Suisse provides various financial services to customers in Switzerland, Europe, the Middle East, Africa, the Americas and the Asia Pacific region. See Compl. ¶ 2. "The company offers private banking and wealth management solutions, including advisory, investment, financial planning, succession planning, and trust services; and financing and lending, and multi-shore platform solutions." Id. Credit Suisse has a history of business dealings with Russian oligarchs. See id. ¶ 3. An article published in the *Financial Times* on February 7, 2022, titled "Credit Suisse [] yacht loans to oligarchs and tycoons," referred to a recent investor presentation for a synthetic securitization deal (the "Securitization Deal"), in which Credit Suisse securitized $80 million in loans related to a portfolio of loans made to oligarchs and tycoons. See id. The article also disclosed that in 2017 and 2018, Credit Suisse experienced 12 defaults on yacht and aircraft loans, one-third of which were related to U.S. sanctions on Russian oligarchs. See id.

In November 2021, Credit Suisse had entered into the Securitization Deal as Russia's major military buildup on the Russo-Ukranian border ramped up. See id. ¶¶ 4-5. On February 24, 2022, Russian military forces invaded Ukraine. See id. ¶ 6. Following the invasion, Western governments, including the United States, Canada, and the European Union, imposed significant sanctions on Russia. See id. Those sanctions included measures targeting Russia's ultrawealthy oligarchs by denying them access to the global financial system and, in some cases, authorizing the seizure of certain of their high-value assets located outside of Russia. Id.

Shortly after the start of the invasion and the imposition of sanctions by Western governments, news outlets reported that Credit Suisse had requested nonparticipating investors who received information about Credit Suisse's loan portfolio to destroy and permanently erase any confidential information that Credit Suisse provided to them regarding the Securitization Deal. See id. ¶ 7. On March 28, 2022, the U.S. House of Representatives Committee on Oversight and Reform sent Credit Suisse a letter requesting information and documents about a portfolio of loans secured by yachts and private jets owned by clients, potentially including sanctioned Russian individuals. See id. ¶ 9. That letter referenced reports that Credit Suisse had requested that hedge funds and other nonparticipating investors "destroy documents" related to yachts and private jets owned by the bank's clients, adding: "'Given the timing of this request and its subject matter, . . . Credit Suisse's action raises significant concerns that it may be concealing information' about whether participants in the deal may be 'evading sanctions' imposed by the West after Russia's invasion of Ukraine." Id. On this news, the price of Credit Suisse common stock fell $0.21 per share, or 2.58 percent, to $7.94 per share at the close of trading on March 28, 2022. See id. ¶ 10.

The Complaint in this action alleges that during the Class Period, Credit Suisse and its Chief Executive Officer and Chief Financial Officer (collectively, "defendants") made false and misleading statements and/or failed to disclose that: (i) Credit Suisse had deficient disclosure controls and procedures and internal control over financial reporting; (ii) Credit Suisse had a practice of lending money to Russian oligarchs subject to U.S. and international sanctions, which created a significant risk of violating rules pertaining to those sanctions and future sanctions; (iii) the foregoing conduct subjected the Company to an increased risk of

3

heightened regulatory scrutiny and/or enforcement actions; (iv) the Securitization Deal concerned loans that Credit Suisse made to Russian oligarchs previously sanctioned by the U.S.; (v) the purpose of the Securitization Deal was to offload the risks associated with such loans and mitigate the impact on Credit Suisse of sanctions likely to be implemented by Western nations in response to Russia's invasion of Ukraine; (vi) Credit Suisse's request that nonparticipating investors destroy documents related to the Securitization Deal was intended to conceal the Company's noncompliance with U.S. and international sanctions in its lending practices; and (vii) the foregoing, once revealed, was likely to subject the Company to enhanced regulatory scrutiny and significant reputational harm.  Id. ¶ 8.

## DISCUSSION

**I.    Notice Requirement and the Filing of Timely Motions**

As an initial matter, the PSLRA requires that the plaintiff who files the first action publish notice to the class within 20 days of filing the action, in "a widely circulated national business-oriented publication or wire service," advising members:

(I)    of the pendency of the action, the claims asserted therein, and the purported class period; and

(II)    that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

15 U.S.C. § 78u-4(a)(3)(A)(i).

On April 29, 2022, the same day that the instant Complaint was filed, a notice was published in *Globe Newswire* announcing that a securities class action had been filed against Credit Suisse and several of its officers.  See Press Release, DE #6-5.  The published press release advised those who wished to serve as lead plaintiff to file the appropriate motion no

4

later than June 28, 2022.  See id. at ECF p. 2.  The filing of a press release through *Globe Newswire* is an appropriate means of satisfying the PSLRA's notice requirement.  See, e.g., Rodriguez v. DraftKings Inc., 21 Civ. 5739 (PAE), 2021 WL 5282006, at *2 (S.D.N.Y. Nov. 12, 2021); Gutman v. Lizhi Inc., 21-CV-00317 (LDH)(PK), 2021 WL 8316283, at *1 (E.D.N.Y. Apr. 28, 2021).

Based on the April 29, 2022 publication date, the 60-day period in which members of the putative class could move to serve as lead plaintiff expired on June 28, 2022.  Accordingly, having been filed on June 28, 2022, the pending motion for appointment was timely filed with this Court.

## II.    Appointment of Lead Plaintiff

The PSLRA sets forth the procedure for the appointment of a lead plaintiff in a class action brought under the Exchange Act.  The PSLRA's legislative history reveals that Congress enacted the law in response to class action abuses, as plaintiffs' lawyers would otherwise "race to the courthouse" to secure the lead plaintiff designation.  See *In re* Olsten Corp. Sec. Litig., 3 F.Supp.2d 286, 294 (E.D.N.Y. 1998), opinion adhered to on reconsideration, 181 F.R.D. 218 (E.D.N.Y. 1998).  "By enacting the PSLRA, Congress intended to 'increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel.'"  Id. (quoting H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.), reprinted in 1995 U.S.C.C.A.N. 730).  "As such, Congress sought to encourage institutional investors and other class members with large amounts at stake to step forward as the ideal lead plaintiffs in private securities

litigation." Silverberg v Dryships Inc., 17-CV-4547 (SJF)(ARL), 2018 WL 10669653, at *4 (E.D.N.Y. Aug. 21, 2018) (internal quotation marks and citation omitted).

The PSLRA directs the court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members" (generally known as the "most adequate plaintiff"). 15 U.S.C. § 78u-4(a)(3)(B)(i). Courts follow a two-step process to determine the most adequate plaintiff. See generally Darish v. N. Dynasty Minerals Ltd., 20-cv-5917 (ENV), 2021 WL 1026567, at *5 (E.D.N.Y. Mar. 17, 2021); In re Gentiva Sec. Litig., 281 F.R.D. 108, 111-12 (E.D.N.Y. 2012). In the first stage of the inquiry, the PSLRA establishes a "presumption" that the most adequate plaintiff is the person or group of persons who or that:

(aa) has either filed the complaint or made a motion in response to a notice . . . ;

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Once the Court determines that there exists a presumptively adequate lead plaintiff, it must move to the second stage of the inquiry: whether that presumption has been sufficiently "rebutted" by a member of the purported plaintiff class. See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Specifically, the presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—

(aa) will not fairly and adequately protect the interests of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class."

6

Id.

### A.    Largest Financial Interest

The PSLRA requires courts to "adopt a presumption that the most adequate plaintiff . . . has the largest financial interest in the relief sought by the class[,]" 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), but offers no statutory guidance for determining which plaintiff has the largest financial interest, see Darish, 2021 WL 1026567, at *5.  Courts in the Second Circuit have adopted the four "*Olsten* factors" to determine which plaintiff has the largest financial interest: "(1) the [total] number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period." *In re* Olsten Corp., 3 F.Supp.2d at 295 (citing Lax v. First Merchs. Acceptance Corp., No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)); accord Chitturi v. Kingold Jewelry, Inc., 20-CV-2886-LDH-SJB, 2020 WL 8225336, at *4 (E.D.N.Y. Dec. 22, 2020); *In re* Gentiva, 281 F.R.D. at 112.  Most crucial to the Court's determination is the fourth factor—the approximate financial loss suffered.  See Plymouth Cnty. Ret. Ass'n v. Innovative Tech., Inc., 21 Civ. 4390 (VM), 2021 WL 4298191, at *2 (S.D.N.Y. Sept. 21, 2021), adhered to on reconsideration sub nom. Plymouth Cnty. Ret. Ass'n v. Array Tech., Inc., 2021 WL 5051649 (S.D.N.Y. Nov. 1, 2021); Darish, 2021 WL 1026567, at *5; Baughman v. Pall Corp., 250 F.R.D. 121, 125 (E.D.N.Y. 2008).

Since Jimenez is the only movant, he necessarily has the largest financial interest: during the noticed Class Period of March 19, 2021 and March 25, 2022, Jimenez claims to have suffered losses totaling $621.  See Jimenez Loss Chart, DE #6-4.

7

**B.       Satisfaction of Rule 23**

After the Court has identified the plaintiff with the largest financial interest in the litigation, it must "focus on that plaintiff alone and be limited to determining whether he satisfies the other statutory requirements [of the PSLRA]." Darish, 2021 WL 1026567, at *6 (citation and internal quotation marks omitted); Khunt v. Alibaba Grp. Holding Ltd., 102 F.Supp.3d 523, 535 (S.D.N.Y. 2015) (same); Pirelli, 229 F.R.D. at 411 (same).  Under the PSLRA, in order to serve as lead plaintiff, the movant with the largest financial interest must also satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure. See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).  Rule 23(a) specifies four requirements for certification of a class action: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

In determining whether the presumptively most adequate plaintiff satisfies Rule 23 for the purposes of the PSLRA, a court need only consider whether the movant's claims are typical and adequate, and the presumptive lead plaintiff need only make a preliminary, prima facie showing that its claims satisfy the typicality and adequacy requirements of Rule 23. See Plymouth Cnty. Ret. Ass'n, 2021 WL 4298191, at *2; Chitturi, 2020 WL 8225336, at *5; In re Gentiva, 281 F.R.D. at 112 (citation omitted).  At this initial stage of the litigation, "a wide ranging analysis under Rule 23 is not appropriate . . . and should be left for consideration of a motion for class certification." Darish, 2021 WL 1026567, at *6 (citation and quotation marks omitted).[1]

---

[1] "[A]ny finding that Rule 23 requirements have been met at this stage do[es] not preclude a later challenge in the context of a Rule 23 class certification motion." Ford v. Voxx Int'l Corp., No. 14-CV-4183(JS)(AYS), 2015 WL 4393798, at *3 (E.D.N.Y. July 16, 2015) (citations omitted).

Jimenez has made the requisite preliminary showing with respect to Rule 23(a)'s typicality requirement. Cases in the Second Circuit have held that the typicality requirement is met where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Brady v. Top Ships Inc., 324 F.Supp.3d 335, 350 (E.D.N.Y. 2018) (quoting *In re* Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). Like other members of the putative class, Jimenez, who bought 200 shares of Credit Suisse securities on April 26, 2021, see Certification of Yansi Jimenez (June 28, 2022), DE #6-6 at ECF pp. 2, 4, purchased the stock during the Class Period, at an allegedly artificially inflated price purportedly caused by defendants' misrepresentations or omissions about Credit Suisse's exposure to risks relating to its loans to Russian oligarchs. After it was revealed that Credit Suisse would be subject to enhanced regulatory scrutiny, its stock price declined, causing injury to Jimenez of the same kind, and arising out of the same facts, as that suffered by other class members. Further, Jimenez's claims for violation of the securities laws and resulting damages are based on the same legal arguments as those of the other class members. Thus, Jimenez has preliminarily demonstrated typicality under Rule 23(a).

Nevertheless, Jimenez does not preliminarily satisfy the adequacy requirement of Rule 23(a). The adequacy requirement is satisfied where: "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." Plymouth Cnty. Ret. Ass'n, 2021 WL 4298191, at *2 (internal quotation marks and citation omitted). Jimenez

9

claims that he "incurred significant losses" in the amount of $621 as a result of the disclosures of Credit Suisse's fraud, based on his $2,052 investment in Credit Suisse common stock.[2] See Memorandum in Support of Motion to Appoint Counsel and Lead Plaintiff (June 28, 2022) at 1, 7, DE #6-2; id. at 2 (Jimenez claims a "considerable financial interest").  To be sure, Jimenez has submitted a declaration attesting to his understanding of the responsibilities of a lead plaintiff under the PSLRA and his willingness to oversee the litigation and counsel.  See Declaration of Yansi Jimenez (June 28, 2022), DE #6-7.  The Court concludes that Jimenez nevertheless lacks a sufficient financial interest in the outcome of the case to incentivize him to monitor counsel's performance and control the litigation on behalf of the putative class.

"The principal impetus underlying [the PSLRA] was the belief that the plaintiff's bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement."  Greebel v. FTP Software, Inc., 939 F.Supp. 57, 58 (D. Mass. 1996) (citation omitted).  Accordingly, under the PSLRA, the lead plaintiff must have a substantial stake in the litigation to ensure it has the ability and incentive to control counsel.  Institutional investors, in particular, were thought by Congress to have the sophistication and ability to control complex litigation.  See Silverberg, 2018 WL 10669653, at *4.  Indeed, the principal focus of the PSLRA, as reflected in its legislative history, was that large institutional investors, and not class action counsel, would make the strategic decisions in the litigation.  See H.R. Rep. No. 104-369, at 32 (lead plaintiff procedure "intended to increase the likelihood that parties with significant holdings in issuers,

---

[2] Defendants suggest that Jimenez's actual loss is more likely no more than $42.  See Memorandum in Opposition (Aug. 10, 2022) at 6, DE #17.  The Court assumes for the purposes of this opinion that Jimenez's estimate of a $621 loss is accurate.

10

whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel"); id. at 32-35; S. Rep. No. 104-98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679 (Congress intended "to empower investors so that they—not their lawyers—exercise primary control over private securities litigation"); id. at 10 ("The lead plaintiff should actively represent the class."). The PSLRA was intended to avoid lawyer-driven litigation. See id. ("The Committee believes that the lead plaintiff—not lawyers—should drive the litigation."). Congress particularly intended to "encourage institutional investors to take a more active role in securities class action lawsuits[,] . . . [which would] ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions." H.R. Rep. No. 104-369 at 34. "The theory of these provisions was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff . . . would be motivated to act like a 'real' client, carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price." In re Razorfish, Inc. Sec. Litig., 143 F.Supp.2d 304, 307 (S.D.N.Y. 2001). Although an institutional investor need not always be chosen as lead plaintiff, an individual investor should have comparable ability and motivation to control the litigation. See H.R. Rep. No. 104-369 at 34 ("Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake.").

As discussed above, the PSLRA was intended to minimize the risk of a class action in which "a named class representative has a minimal financial stake in the case and acts primarily as a tool of the lawyers who may well have recruited him." Bensley v. FalconStor

Software, Inc., 277 F.R.D. 231, 234 n.8 (E.D.N.Y. 2011) (citation and internal quotation marks omitted); see Silverberg, 2018 WL 10669653, at *4. Indeed, the PSLRA was designed to avoid a scenario wherein counsel have a greater stake in the litigation than do the plaintiffs. See S. Rep. No. 104-98, at 6-7; H.R. Rep. 104-50, at 17 (1995) ("class counsel frequently has a significantly greater interest in the litigation than any individual member of the class"). For example, counsel "may have a greater incentive than the members of the class to accept a settlement that provides a significant fee and eliminates any risk of failure to recoup funds already invested in the case." H.R. Rep. No. 104-50, at 18. The PSLRA thus commands the court to appoint as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members[.]" 15 U.S.C. § 78u-4(a)(3)(B)(i).

This Court is not satisfied that Jimenez has a sufficient interest in the litigation to vigorously pursue the claims of the class.[3] See Richman v. Goldman Sachs Grp., Inc., 274 F.R.D. 473, 477 (S.D.N.Y. 2011) (in rejecting individual investor's motion for appointment, court finds that "the dollar amount and her 'financial interest' are minimal to the point of being *de minimis*. Her proposed relief would result in a very tiny tail wagging a very large dog."). If selected as lead plaintiff, Jimenez's extremely modest stake (at most, $621) is unlikely to provide the kind of incentive for close supervision of counsel that the PSLRA contemplates. See *In re* Razorfish, 143 F.Supp.2d at 310 (describing stake in the litigation of individual with

---

[3] Carlos de March Bosch, the named plaintiff, suffered a significantly greater loss than Jimenez and is represented by the same counsel as Jimenez; however, in response to the Court's inquiry, see Minute Entry (July 27, 2022) ("7/27/22 Minute Entry"), DE #13, he submitted a declaration in which he asserted that, having considered his "various professional obligations," he "decided not to seek to serve as Lead Plaintiff[,]" Declaration of Carlos de March Bosch (Aug. 3, 2022) ¶ 2, DE #14-1.

estimated $40,000 loss: "If selected as lead plaintiff, his modest stake is unlikely to provide the kind of incentive for close supervision of counsel that the Reform Act contemplates, let alone an incentive to strongly negotiate counsel's fees."); *In re* Baan Co. Sec. Litig., 186 F.R.D. 214, 217 (D.D.C. 1999) ("Baan I") (where members of proposed lead plaintiff group had "relatively small holdings[,]" court concludes that, "[a]s a result, it is likely that Lead Counsel will have a greater financial stake in the litigation than any of the individual plaintiffs[,]" thereby generating "certain tensions"); see also H.R. Rep. No. 104-369 at 34-35 ("courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were 'fair and reasonable' than is the case with settlements negotiated by unsupervised plaintiffs' attorneys").  Indeed, based on the limited information before the Court, it already appears that Jimenez lacks the interest and incentive to effectively manage his counsel and the litigation on behalf of putative members of the class.  In particular, in response to the Court's Order of September 8, 2022, directing the movant to file a copy of his retainer agreement with Pomerantz LLP, see Scheduling Order (Sept. 8, 2022), Jimenez filed a retainer agreement bearing the same date as the Court's Order, with a fee provision strongly favoring counsel over the putative class, see [Sealed] Retainer Agreement, DE #20.  It may reasonably be inferred that no retainer agreement existed until the Court directed its production and that Jimenez failed to negotiate a fee arrangement that favors the class he seeks to represent.  Simply put, Jimenez has not demonstrated that he would adequately represent the interests of class members.  Congress intended that the lead plaintiff would select the lawyers, rather than having the lawyers select the lead plaintiff.  See H.R. Rep. No. 104–369, at 35.  For all that appears in this case, the opposite occurred.

13

The Court quickly disposes of several of the movant's arguments.  First, Jimenez argues that the PSLRA requires that the Court appoint him lead plaintiff simply because he is the sole movant.  According to Jimenez, the statute's language that the court "shall appoint as lead plaintiff" is mandatory and removes a court's discretion to deny appointment.  See Supplemental Memorandum of Law in Further Support (Aug. 3, 2022) ("Supp. Mem.") at 2, DE #15.  On the contrary, however, it is well settled that the Court is obligated to evaluate the requirements of the PSLRA, even though Jimenez's motion is unopposed.  See Clifford v. TRON Found., 20-CV-2804 (VSB), 2020 WL 3577923, at *2 (S.D.N.Y. June 30, 2020); Salim v. Mobile TeleSystems PJSC, 19-CV-1589 (AMD)(RLM), 2019 WL 11095253, at *2 n.3 (E.D.N.Y. Sept. 11, 2019) ("a court is required to conduct this two-step analysis even when . . . a movant's motion to appoint lead plaintiff is unopposed"); City of Warren Police v. Foot Locker, Inc., 325 F.Supp.3d 310, 314 (E.D.N.Y. 2018) ("Even when a motion to appoint lead counsel is unopposed, the Court must still consider the factors under the PSLRA to ensure that the movant is the most adequate plaintiff."); Springer v. Code Rebel Corp., 16-cv-3492 (AJN), 2017 WL 838197, at *1 (S.D.N.Y. Mar. 2, 2017) ("the Court nevertheless addresses the requirements under the [PSLRA] for appointment of lead plaintiffs, as other courts have done so even in the context of unopposed motions"); City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 844 F.Supp.2d 498, 500-01 (S.D.N.Y. 2012); In re Symbol Techs., Inc. Sec. Litig., No. 05-CV-3923 (DRH)(JO), 2006 WL 1120619, at *2-3 (E.D.N.Y. Apr. 26, 2006); accord In re Lucent Techs., Inc. Sec. Litig., 194 F.R.D. 137, 152 (D.N.J. 2000) ("The court is under no obligation to accept . . . a proposed lead plaintiff merely because [its] proposed appointment is unopposed by other members of the [p]roposed

14

[c]lass."); Baan I, 186 F.R.D. at 215 ("[W]here no opposition has been noted, Congress envisioned that courts still would play an independent, gatekeeping role to implement the PSLRA[.]").

Moreover, Jimenez's argument ignores the PSLRA's requirement that the movant satisfy Rule 23's typicality and adequacy requirements.  Under the terms of the statute, the Court cannot appoint as lead plaintiff a movant who fails to satisfy the requirements of Rule 23, even in the absence of any competing motion.  See In re Cendant Corp. Litig., 264 F.3d 201, 265 (3d Cir. 2001) ("a court might conclude that the movant with the largest losses could not surmount the threshold adequacy inquiry if it lacked legal experience or sophistication . . . ."); Finocchiaro v. NQ Mobile, Inc., 15 Civ. 6385 (NRB), 2016 WL 7031613, at *3 (S.D.N.Y. Dec. 1, 2016) (denying sole motion for appointment by movant who court found "cannot adequately represent the class"); In re Quintus Sec. Litig., 201 F.R.D. 475, 491 (N.D. Cal. 2001) (court finds that "none of the lead plaintiffs is adequate," but appoints a nominal plaintiff temporarily); Yousefi v. Lockheed Martin Corp., 70 F.Supp.2d 1061, 1069–70 (C.D. Cal. 1999) (rejecting the one motion for appointment as lead plaintiff, and finding that each of two co-lead plaintiffs' individual "financial stakes are not weighty enough for them to expend large amounts of time and resources supervising this suit"); see also In re Baan Co. Sec. Litig., 271 F.Supp.2d 3, 16 (D.D.C. 2002) ("Baan II") ("the Court is unable to proceed to consider plaintiffs' motion for class certification until adequate lead plaintiffs have been identified"); In re Century Bus. Servs. Sec. Litig., 202 F.R.D. 532, 536-41 (N.D. Ohio 2001) (finding none of the groups that sought appointment as lead counsel satisfied Rule 23's requirements).

In addition, the Court rejects the movant's argument that defendants—whom the Court invited to weigh in on the issue—lack standing to be heard as to the appointment of lead plaintiff. See 7/27/22 Minute Entry.  No provision of the PSLRA prohibits a defendant from opposing such a motion.  Indeed, where, as here, only one motion for appointment has been filed, the Court "finds that the purpose of the PSLRA in preventing 'lawyer-driven' litigation is best served by having more argument, not less, from any interested source."  City of Pontiac Gen. Emps.' Ret. Sys., 844 F.Supp.2d at 501 n.3; see Finocchiaro, 2016 WL 7031613, at *2; City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Tr. Inc., CV 08-1418 (LDW)(ETB), 2009 WL 10709107, at *2–3 (E.D.N.Y. Mar. 9, 2009), adopted, 2009 WL 10750336 (E.D.N.Y. Mar. 16, 2009); In re Luxottica Grp., S.p.A. Sec. Litig., No. 01-CV-3285, 2004 WL 2370650, at *3 (E.D.N.Y. Oct. 22, 2004); Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co., Inc., 229 F.R.D. 395, 406 (S.D.N.Y. 2004); King v. Livent, Inc., 36 F.Supp.2d 187, 190 (S.D.N.Y. 1999) (holding, in connection with a motion for appointment of lead plaintiff, that "there is no question but that any party can and should be heard.").

Finally, Jimenez argues that the putative class would be prejudiced by denial of his motion for appointment. See Supp. Mem. at 5.  Jimenez speculates that if his motion is denied, "this Action will presumably be dismissed." Id.  To the contrary, the members of the putative class would be prejudiced if the Court were to appoint a lead plaintiff who fails to satisfy Rule 23's adequacy requirement, thereby causing further delays in the future. See In re Allergan PLC Sec. Litig., No. 18 Civ. 12089 (CM)(GWG), 2020 WL 5796763, at *5 (S.D.N.Y. Sept. 29, 2020) (denying motion for class certification, finding that previously

16

appointed lead plaintiff "failed to demonstrate that they would adequately represent the class");

id. at *6-9; Baan II, 271 F.Supp.2d at 16 (in denying without prejudice motion for class

certification, court holds that sole lead plaintiff was inadequate).  The instant securities action

may proceed on an individual basis, without a lead plaintiff, and Jimenez, and any other

plaintiffs, may move to intervene.  See *In re* Allergan PLC Sec. Litig., 2020 WL 5796763, at

*9 (rejected lead plaintiff "is of course free to prosecute its claim individually"); see also *In re*

Cavanaugh, 306 F.3d 726, 731 n.7 (9th Cir. 2002) (reversing district court's appointment

order and observing that, "where no plaintiff willing to serve as lead satisfies the typicality and

adequacy requirements[,] . . . perhaps the case cannot be maintained as a class action").

## CONCLUSION

For the reasons set forth above, Yansi Jimenez's motion for appointment of lead

plaintiff and approval of lead counsel is denied.

Any objection to this Memorandum and Order must be filed with the Honorable Eric

N. Vitaliano by September 26, 2022, or will be deemed waived.

**SO ORDERED.**

Dated:    **Brooklyn, New York**
          **September 12, 2022**

/s/    *Roanne L. Mann*
       **ROANNE L. MANN**
       **UNITED STATES MAGISTRATE JUDGE**

17